## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | |
|---|---|
| SAINT ELIZABETH MEDICAL CENTER, INC., )<br>SUMMIT MEDICAL GROUP, INC., )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>CRANEWARE, INC., )<br>CRANEWARE PLC, )<br>DEARBORN COUNTY, INDIANA, )<br> )<br>Defendants. )<br>————————————————————)<br> )<br>DEARBORN COUNTY, INDIANA, )<br> )<br>Cross Claimants, )<br> )<br>v. )<br> )<br>CRANEWARE PLC, )<br>CRANEWARE, INC., )<br> )<br>Cross Defendants. ) | Case No. 4:24-cv-00112-TWP-TAB |

### ENTRY ON MOTIONS FOR PRELIMINARY INJUNCTION,
### MOTION TO STAY PROCEEDINGS, AND COMPEL ARBITRATION

This matter is before the Court on two Motions for Preliminary Injunction and a Cross-Motion to Stay Proceedings and to Compel Arbitration. Plaintiffs Saint Elizabeth Medical Center, Inc., and Summit Medical Group, Inc. (together, "St. Elizabeth"), initiated this action against Defendant Dearborn County, Indiana (the "County"), and Defendants Craneware, Inc., and Craneware plc (together, "Craneware") after Craneware filed an arbitration demand with the American Arbitration Association ("AAA") seeking to recover license fees which Craneware

believes it is owed under an agreement that it entered into with Dearborn County Hospital, now known as Highpoint Health ("Highpoint") (Filing No. 1).

On August 21, 2024, St. Elizabeth filed a Motion for Preliminary Injunction asking the Court to prohibit Craneware from compelling St. Elizabeth to arbitrate and to stay the arbitration initiated by Craneware (Filing No. 5). Thereafter, on September 20, 2024, the County filed a crossclaim and its own Motion for Preliminary Injunction asking the Court to enter an injunction preventing Craneware from arbitrating claims against the County (Filing No. 25). Craneware then filed a Combined Cross-Motion to Stay Proceedings and to Compel Arbitration pursuant to sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3–4 (Filing No. 42). For the reasons explained in this Entry, St. Elizabeth's Motion for Preliminary Injunction is **denied**, the County's Motion for Preliminary Injunction is **granted**, and Craneware's Motion to Stay Proceedings and to Compel Arbitration is **granted in part and denied in part.**

## I.      BACKGROUND

Plaintiff St. Elizabeth—comprised of Saint Elizabeth Medical Center, Inc. d/b/a St. Elizabeth Healthcare and Summit Medical Group, Inc. d/b/a St. Elizabeth Physicians—are non-profit corporations that operate physician offices, urgent care facilities, and other healthcare facilities in Kentucky and Indiana. (Filing No. 1 at 2).  Craneware is a for-profit company that provides software and other technology services targeted to the healthcare industry. *Id*. Highpoint, originally Dearborn County Hospital, was formed as a county hospital organized under the laws of the State of Indiana *Id*. at 3.

On January 19, 2018, Highpoint entered into a License and Service Agreement (the "LSA") with Craneware to use Craneware's software and services. *Id.* The initial term of the LSA was seven years, and it required an annual license fee to be paid on January 19 every year after. *Id.*

On May 25, 2018, Craneware and Highpoint entered into an amendment of the LSA, replacing the old dispute resolution clause with the following:

> **IV. Dispute Resolution.** Any dispute, controversy or claim arising out of, relating to, or in connection with this Agreement, including the breach, termination or validity thereof, shall be resolved exclusively by binding arbitration conducted by the [AAA] in accordance with it Commercial Arbitration Rules then in effect . . . before a single arbitrator who neither resides or works in any county in which any Customer Facility is situated, with the final hearing to be held in the county or parish of the Customer's headquarters. The arbitral tribunal shall have the power to rule on any challenge to its own jurisdiction or to the validity or enforceability of any portion of the agreement to arbitrate. The parties agree to arbitrate solely on an individual basis, and, regardless of the AAA's Rules, this Agreement does not permit class arbitration or any claims brought as a plaintiff, claimant, or class member in any class or representative proceeding. The arbitral tribunal many not consolidate the claims of any party to this Agreement with those of any third party, and may not otherwise preside over any form of a representative or class proceeding. A party may enter judgment on the award rendered by the arbitrator in any court having jurisdiction. The prevailing party shall be entitled to recover all reasonable attorneys' fees and costs related to the dispute and arbitration.

(Filing No. 1-2 at 2). Further, the LSA contained the following non-assignment clause:

> Neither party may assign its rights under this Agreement unless the assignor (1) obtains the non-assigning party's advance written consent, (2) the provisions of this Agreement are fully binding on any such permitted assign, and (3) with respect to an assignment by Client, the permitted assign agrees to pay Craneware its then annual fees for the remainder of the then-current Term. Any assignment entered into without the other party's advance written consent shall be void. Notwithstanding the foregoing, either party may assign this Agreement to an entity acquiring all or substantially all of its assets.

(Filing No. 1-1 at 8).

On October 31, 2020, Highpoint and the County entered into an Asset Acquisition Agreement (the "Asset Agreement") with St. Elizabeth for the purchase of Highpoint's assets. Pursuant to Section 1.1(d) of the Asset Agreement, St. Elizabeth agreed to acquire "[a]ll of Highpoint's rights, title and interest in the contracts, [e]xisting [l]eases, service agreements and other agreements including, but not limited to, those listed on Schedule 1.1(d) attached hereto (the 'Assumed Contracts'), including rights to any security deposits." (Filing No. 1-3 at 7). As

consideration for the transfer of assets, Section 2.1 required Highpoint to pay "the liabilities owed to vendors and creditors set forth in Schedule 2.1" on or before closing. *Id.* at 9. Item Number 10 on Schedule 2.1 required "[p]ayment of all accounts payable and accrued liabilities on the [Highpoint] books as of October 31, 2020 (if not included on this list)." (Filing No. 1-4 at 2).

The final relevant provision of the Asset Agreement is contained in Section 11.1(i), concerning assignments or terminations requiring consent, and states as follows:

> Highpoint and St. Elizabeth, at [c]losing, shall execute and deliver assignments of the Assumed Contracts in a form attached hereto as Exhibit N. Highpoint shall assist St. Elizabeth in obtaining all required consents to the assignments. In addition, prior to [c]losing, St. Elizabeth shall determine which Assumed Contracts it wants to terminate, and, at St. Elizabeth's direction, Highpoint shall send a termination notice for each; provided, however, that if such Assumed Contracts cannot be terminated with an effective date prior to [c]losing, then St. Elizabeth agrees that it shall remain an Assumed Contract. If a required consent or termination cannot be obtained, Highpoint agrees to provide access to any services, Property or Equipment governed by the Assumed Contracts to St. Elizabeth to the fullest extent possible and St. Elizabeth shall indemnify Highpoint against any Losses related to any lease, contract or other agreement identified on Schedule 1.1(d) for which consent to assignment or termination is not obtained.

(Filing No. 1-3 at 30).

In a letter dated June 1, 2023, Craneware asserted breach of contract against the County for failure to pay the annual license fees in 2021, 2022, and 2023 (Filing No. 1-6 at 2–5). Then, in a letter dated June 22, 2023, the County responded asserting that the County had "never owned or operated [Highpoint], that "[Highpoint] was a separate legal entity," that "any liabilities pertaining [to Highpoint] did not remain with [the] County" pursuant to Indiana Code § 16-22-3-18(d), and that the County had the understanding that "all obligations were paid, and services were terminated" under the LSA effective October 31, 2020 (Filing No. 1-7 at 2–3).

Indiana Code § 16-22-3-18(d) states:

(d) In the event of a transfer under this section, the county is not liable for:

(1) any liabilities of the hospital that:

    (A) were incurred on or before; or

    (B) are incurred at any time after;

the transfer date; or

(2) any future liabilities incurred by the successor entity;

unless otherwise agreed to by the county at the time of the transfer in the transfer document. Any liabilities described in this subsection are the responsibility of the entity to which the assets were transferred, unless agreed to otherwise in the transfer document.

*Id.*

Craneware subsequently sent a letter to St. Elizabeth dated July 12, 2023, citing Indiana Code § 16-22-3-18(d) to claim that St. Elizabeth was responsible for the breach and any resulting damages to Craneware ([Filing No. 1-8 at 2](#)). Finally, in a letter dated July 31, 2023, St. Elizabeth responded to Craneware's claims by denying all allegations ([Filing No. 1-9 at 2](#)). Craneware filed an arbitration demand with AAA on June 6, 2024 ([Filing No. 1-10](#)).[1]

On August 21, 2024, St. Elizabeth initiated this action for declaratory judgment and injunctive relief to prevent Craneware from forcing it into arbitration proceedings without its consent ([Filing No. 1](#)). That same day, it filed its Motion for Preliminary Injunction ([Filing No. 5](#)). On September 6, 2024, the County also filed a Motion for Preliminary Injunction ([Filing No. 25](#)), and on September 20, 2024, Craneware filed a combined Cross-Motion to Stay Proceedings and Compel Arbitration ([Filing No. 42](#)).

---

[1] St. Elizabeth argues that Craneware is seeking to force it to arbitrate two issues that it never agreed to arbitrate. The first issue is whether [St. Elizabeth] is responsible for the payment of allegedly unpaid license fees under the Craneware License Agreement between Craneware and Dearborn County Hospital. The second issue is whether Craneware is in fact owed any license fees under the Craneware License Agreement or whether that agreement was terminated and settled by Craneware and Dearborn County Hospital in 2020 as Dearborn County has asserted and Craneware's prior behavior suggests is true. ([Filing No. 5-1 at 5](#)).

## II.  <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks and citation omitted). When a district court considers whether to issue a preliminary injunction, the party seeking the injunctive relief must demonstrate that:

> (1) it has a reasonable likelihood of success on the merits of its claim; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if preliminary injunctive relief is denied; (4) the irreparable harm it will suffer without preliminary injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm the public interest.

*Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citations and internal quotation marks omitted). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

### III.     DISCUSSION

St. Elizabeth argues that a preliminary injunction is necessary to ensure that it is not forced to arbitrate with Craneware while this Court considers the merits of its request for a permanent injunction and declaratory judgment that no valid arbitration agreement exists between St. Elizabeth and Craneware (Filing No. 5-1 at 2). St. Elizabeth contends that a denial of a preliminary injunction would cause irreparable harm, and a preliminary injunction prohibiting Craneware from compelling it to arbitrate is necessary. In its motion for injunctive relief, the County also request that the Court enter a preliminary injunction preventing Craneware from arbitrating claims against the County under a contract to which the County is not a party. Craneware argues that both St. Elizabeth and the County are required under the LSA, as amended, to proceed to arbitration and cross-moves to compel arbitration and stay these proceedings pending that arbitration. The Court will address St. Elizabeth's and the County's motions for preliminary injunctions and then Craneware's Cross-Motion to Stay Proceedings and to Compel Arbitration.

### A.     The Motions for Preliminary Injunction

The Court will first address the County and St. Elizabeth's respective likelihood of successes on the merits. The Court will then discuss, in turn, the lack of adequate remedy at law and likelihood of irreparable harm, the balance of harms, and public policy considerations as to both movants.

#### 1.     The County's Likelihood of Success on the Merits

The likelihood of success on the merits turns on the issue of whether the arbitration clause contained in the LSA can be enforced against the County as a non-signatory. "'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

Further, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649.

"'[A]s a general rule, a [party] who is not a signatory to a contract containing an arbitration clause is not bound by the arbitration clause[.]'" *Grundstad v. Ritt*, 106 F.3d 201, 204 (7th Cir. 1997) (alterations in original) (quoting *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 595 (6th Cir. 1995)). However, Section 2 of the Federal Arbitration Act allows federal courts to look to state law to determine if there are any applicable exceptions to the general rule. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). Indiana law recognizes "a series of doctrines, based on common law principles of contract and agency law, for binding non-signatories to arbitration agreements." *Smith Barney v. StoneMor Operating, LLC*, 959 N.E.2d 309, 315 (Ind. Ct. App. 2011) (quotation marks and citation omitted). Such doctrines include: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id.* (quotation marks and citation omitted).

The parties do not dispute whether the entity with the authority to bind the County, the Dearborn County Commissioners (the "Commissioners"), signed the LSA—it did not. Rather, the dispute is whether the County can be bound by the LSA that Highpoint signed. Craneware argues that an exception to the general rule that non-signatories are not bound by an arbitration agreement exists because Highpoint was an alter ego of the County (Filing No. 43 at 13). The County argues that it is not subject to the arbitration clause because the County is a separate and distinct entity from Highpoint, and Indiana law makes clear that the County has no liability for the obligations of Highpoint (Filing No. 26 at 4). Craneware refutes such claims by arguing that a 1950 resolution stated that Highpoint was established "as a direct instrumentality of Dearborn County," that the Commissioners signed the Asset Agreement "on behalf of Dearborn County, Indiana," and that

8

there is no certainty that Indiana law absolves the County of any liability (Filing No. 43 at 14–18 (emphasis, quotation marks, and citations omitted)).

In support of its argument that Highpoint was merely an alter ego of the County, Craneware cites an unpublished opinion from this Court, *Kentuckiana Medical Center, LLC v. Clark County*, No. 05CV0086, 2006 U.S. Dist. LEXIS 3298 (S.D. Ind. Jan. 18, 2006), for the proposition that "the [Indiana county hospital] statutes and practical realities illustrate that county hospitals are merely instrumentalities, component units, or alter egos of the county itself, including, when, as here, they enter into contracts with private vendors." (Filing No. 43 at 13 (emphasis omitted)). The Court stated in *Kentuckiana*,

> [the statutory provisions relating to county hospitals] reveal a substantial entanglement of interest, control, and power between the county commissioners and a county hospital board. Additionally, these statutes demonstrated that [in] many ways . . . a unitary economic interest exists between the county and its hospital. At the least, these interrelationships support an inference that a county hospital and its respective county can constitute a single economic actor for purposes of an anti-trust analysis, thereby attributing the actions of a county hospital to its respective county commissioners.

*Id.* at 24–25.

The Court is not persuaded that Highpoint was the alter ego of the County. Craneware overextends the holding in *Kentuckiana*, which held only that a county hospital and a county can have economic connections sufficient to "support an inference that a county hospital and its respective county can constitute a single economic actor for purposes of an anti-trust analysis." *Id.* Such a holding does not declare that in Indiana, county hospitals are always the alter egos of their respective counties and therefore may bind their counties for the purposes of state contract law. Further, the express language in *Kentuckiana* limited its holding to anti-trust cases rather than contract disputes. *Id.*

In a footnote, Craneware acknowledges the limitations of the holding but characterizes *Kentuckiana* as concluding "that county hospitals and counties are unitary actors," and arguing that such conclusion is "equally apt for the case *sub judice*." (Filing No. 43 at 13). The Court disagrees. *Kentuckiana* did not hold that county hospitals and counties are unitary actors. Rather, the holding was limited to finding that for the purposes of a motion to dismiss under an anti-trust analysis, the county hospital statutes support an inference that county hospitals and their respective counties can constitute a single economic actor. *Id. Kentuckiana* is inapplicable to the case at bar.

Moreover, Highpoint's board (the "Board") is the "supreme authority" of Highpoint. Ind. Code § 16-22-3-1. The Board is "responsible for the management, control, and operation of [Highpoint]." *Id.* Indiana Code § 16-22-3-6(2) expressly grants the Board the power to contract for "[s]ervices reasonably required to operate and maintain the hospital, including the management of the hospital." The LSA falls within such power. Indiana Code § 16-22-3-30 also states that the Board's powers are to be "liberally construed to effect the purposes of this article." Further, the Indiana Home Rule Act prevents local governments from exercising powers that are "expressly granted to another entity." Ind. Code § 36-1-3-5. Thus, the County and the Commissioners could not enter into contracts for services to operate and maintain Highpoint. Only the Board had the authority to do so.

Craneware asserts various other arguments, which the Court will address in turn. First, Craneware cites an auditor's statement that a "financial benefit/burden relationship exists between [the County] and [Highpoint]" and for that reason, "[Highpoint] is considered a component unit of the County." (Filing No. 43 at 14 (emphasis omitted) (quoting Filing No. 43-3)). However, the auditor's statement only identifies a financial relationship between the County and Highpoint and does not imply they are effectively one entity. Further, the Governmental Accounting Standards

Board statements, which were adopted by Highpoint and referred to throughout the auditor's statement, define "component units" as "legally separate organizations for which the elected officials of the primary government are financially accountable." Statement No. 14 at 8, Governmental Accounting Standards Bd. (June 1991), https://gasb.org/page/ShowPdf?path=GASBS+14.pdf&title=GASB%20STATEMENT%20NO.%2014,%20THE%20FINANCIAL%20REPORTING%20ENTITY. Regardless, the Court will not overlook a controlling statute in favor of an auditor's statement.

Second, Craneware argues that the Commissioners signed the Asset Agreement "on behalf of" the County (Filing No. 43 at 14–15). The Commissioners, as the County executive, are required to agree for a county hospital to sell its assets to a non-profit corporation, as is the case here. *See* Ind. Code § 16-22-3-18. But this argument ignores the plain language of the Asset Agreement, which just before the signatures of the Commissioners, states:

> The Board of Commissioners of Dearborn County, Indiana and the Dearborn County Council join in the execution and delivery of this Agreement solely to: (1) assume all liabilities, known and unknown, for Pension Plan Losses, and to bind themselves to the provisions of Sections 1.5, 6.7, 8.2(m) and Article V of this Agreement, (2) confirm and agree that all approvals from Dearborn County needed to authorize Highpoint to enter into this Agreement have been obtained and (3) acknowledge that Dearborn County is a third party beneficiary of this Agreement and has the ability to enforce this Agreement.

(Filing No. 1-3 at 39).

Section 1.5 states that the County has no liability except as specifically agreed to, Section 6.7 states that the County agrees to amend and delete provisions referenced in Indiana Code § 16-22-3-18(f) (the county property reversion requirement), Section 8.2(m) states that the County agrees to deliver copies of the required resolutions for the sale, and Article V discusses non-competition (Filing No. 1-3). None of the provisions that the County joined on a limited basis provides any assumption of the LSA.

11

Third, Craneware argues that the 1950 resolution that created Highpoint established Highpoint as "a direct instrumentality of" the County (Filing No. 43 at 14 (emphasis omitted)). However, the Indiana General Assembly passed the county hospital laws in 1993. *See* Health and Hospitals—Recodification, Ind. Legis. Serv. P.L. 2-1993, at § 5 (S.E.A. 24) (1993), codified at Ind. Code § 16-22-3-1. As discussed above, the controlling statutes, in conjunction with Indiana's Home Rule Act, prevent the County from entering into agreements on Highpoint's behalf. Only the Board has the authority to do so. A 1950 resolution under superseded laws does not change the legislature's intent under controlling statutes to make the Board the "supreme authority." Ind. Code § 16-22-3-1.

Fourth, Craneware cites Indiana Code § 16-18-2-86, which defines "county" as a "county that owns and operates a county hospital" for the purposes of title 16, article 22 of the Indiana Code (Filing No. 43 at 14). The County asserts that the statute does not say that county hospitals are "per se 'owned' or 'operated'" by the counties, but rather, the definition only applies to counties that do own and operate county hospitals (Filing No. 48 at 7). However, the Court need not determine whether the County owns Highpoint. Whether the County "owns and operates" Highpoint does not change the controlling statute which, in conjunction with Indiana's Home Rule Act, reserves the power to contract for "[s]ervices reasonably required to operate and maintain the hospital" for the Board. Ind. Code § 16-22-3-6.

Moreover, the Seventh Circuit has held there are two scenarios in which "a non-signatory is a closely related party to an agreement and foreseeably bound by its terms." *Coatney v Ancersty.Com DNA, LLC*, 93 F.4th 1014, 1023 (7th Cir. 2024) (applying Illinois law). First, when "the non[-]signatory's identity is so intertwined with the identity of the signatory that the two cannot be distinguished" and, second, when "the non-signatory is deeply involved in the

negotiation of the contractual terms." *Id.* Neither scenario applies here. The Indiana General Assembly separated the entities via a controlling Board, which is "responsible for the management, control, and operation of the hospital." Ind. Code § 16-22-3-1. In addition, it is undisputed that the County took no part in the negotiations of the LSA. And, even if the County owned Highpoint, basic principles of corporate law explain that a parent corporation may own and operate a subsidiary without being bound by clauses contained in the subsidiary's agreements solely because of its ownership.

Fifth, Craneware cites *Doe v. Carmel Operator, LLC*, 160 N.E.3d 518, 523 (Ind. 2021), for the principle that it may invoke the doctrine of equitable estoppel ([Filing No. 43 at 16](#)). *Doe* states that the doctrine of equitable estoppel may be invoked so that "an outside party not contemplated by the agreement may enforce an arbitration clause against a signatory." *Id.* at 520. Here, Craneware is a signatory rather than a non-signatory third-party beneficiary, so the doctrine of equitable estoppel does not apply.

Craneware's remaining arguments rest on the premise that neither the County nor its alter ego expressly agreed to the arbitration clause. As explained above, the Court is not persuaded by these arguments and holds that no exception to the general rule that a non-signatory will not be bound by an arbitration agreement applies. Therefore, the County is likely to succeed on the merits of its claims.

### 2.  St. Elizabeth's Likelihood of Success on the Merits

The parties do not dispute that St. Elizabeth did not sign the LSA. St. Elizabeth cites the general rule that non-signatories may not be bound by an arbitration clause and argues that no exception applies ([Filing No. 5-1 at 7](#)). Craneware contends that one of the exceptions, assumption of the agreement, applies ([Filing No. 43 at 20](#)). "Express assumption is straightforward—the

delegate promises in word or writing to perform the delegating party's duties under the contract." *Dr. Robert L. Meinders, D.C., Ltd. v. United Healthcare Servs.*, 7 F.4th 555, 562 (7th Cir. 2021). "As for implicit assumption through conduct, 'if a [delegating] party transfers the entire contract, assigning rights as well as delegating performance, an assumption of those duties by the [delegate] will be inferred from the acceptance of the transfer, unless the language or the situation indicates the contrary.'" *Id.* (alterations in original) (quoting E. Allan Farnsworth & Zachary Wolfe, Farnsworth on Contracts § 11.18 (4th ed. 2021)). Moreover, Ind. Code § 16-22-3-18(d) expressly states that "any liabilities described in this subsection are the responsibility of the entity to which the assets were transferred, unless agreed to otherwise in the transfer document." *Id.* Thus, the issue of whether St. Elizabeth assumed the LSA turns on the language of the Asset Agreement and whether such language disclaims assumption of the LSA.

Craneware asserts that Section 1.1(d) of the Asset Agreement causes St. Elizabeth to acquire "[a]ll of Highpoint's rights, title and interest in the contracts, [e]xisting [l]eases, service agreements and other agreements including, but not limited to, those listed in Schedule 1.1(d)." (Filing No. 1-3 at 7). St. Elizabeth contends that the Asset Agreement must be read as a whole and when it is read as a whole, Section 11.1(i) makes clear that St. Elizabeth only assumed contracts that were assigned (Filing No. 47 at 7). Section 11.1(i) states that "Highpoint and St. Elizabeth, at [c]losing, shall execute and deliver assignments of the Assumed Contracts in a form attached hereto as Exhibit N," and "[i]f a required consent or termination cannot be obtained . . . St. Elizabeth shall indemnify Highpoint against any [l]osses related to any lease contract or other agreement identified on Schedule 1.1(d) for which consent to assignment or termination is not obtained." (Filing No. 1-3 at 30). It is the latter part of this Section that St. Elizabeth contends

causes it to only assume contracts "identified on <u>Schedule 1.1(d)</u> for which consent to assignment or termination is not obtained." *Id.*

First, the non-assignment clause of the LSA did not require consent for assignment if, as is the case here, the sale was for "all or substantially all" of Highpoint's assets ([Filing No. 1-1 at 8](#)). Further, the clause "identified on Schedule 1.1(d) for which consent to assignment or termination is not obtained" applies only "if consent to assignment cannot be obtained." ([Filing No. 1-3 at 30](#)). Section 11.1(i) states that "if such Assumed Contracts cannot be terminated with an effective date prior to [c]losing, then St. Elizabeth agrees that it shall remain an Assumed Contract." *Id.* Here, no such consent was sought nor was it necessary, so these portions of Section 11.1(i) are inapplicable, as "required consent or termination" is an express condition precedent which did not occur. Moreover, the absence of consent is not synonymous with "cannot be obtained," as the latter implies that an attempt to obtain consent was made. *Id.*

Second, even if Section 11.1(i) applies, the failure to assign the LSA in violation of Section 11.1(i) does not render it unassumed. Pursuant to Section 1.1(d), "Assumed Contracts" includes "[a]ll of Highpoint's rights, title and interest" in Highpoint's agreements, "including, but not limited to, those listed in Schedule 1.1(d)." *Id.* at 7. Further, Section 11.1(i) only states what happens if required consent or termination cannot be obtained. However, this does not address what the parties agreed to if an Assumed Contract simply isn't assigned for some reason. Indeed, the Asset Agreement does not contemplate what should happen if an Assumed Contract were to fail to be assigned. In the absence of such language in the LSA, the Court concludes that the parties did not "agree[] . . . otherwise," and the plain language of Ind. Code § 16-22-3-18(d) controls.

Next, Craneware argues that the LSA was assumed by St. Elizabeth pursuant to Section 1.3 of the Asset Agreement, titled "Assumed Liabilities." ([Filing No. 43 at 22](#)). Section 1.3 states, in

relevant part, that "St. Elizabeth will assume and agree to pay, perform and discharge when due, and hold Highpoint harmless from and against any future payment and performance, all of the obligations and liabilities, known or unknown, of Highpoint arising in connection with the business and operation of Highpoint." (Filing No. 1-3 at 9). The LSA falls within this definition, as it is a service agreement entered into in connection with the business and operation of Highpoint. St. Elizabeth argues that pursuant to Section 2.1 of the Asset Agreement, as consideration, Highpoint agreed to pay all liabilities owed to vendors and creditors set for in Schedule 2.1. Item No. 10 on Schedule 2.1 required "[p]ayment of all accounts payable and accrued liabilities on the Highpoint books as of October 31, 2020 (if not included in this list)." (Filing No. 1-4 at 2). Craneware does not dispute that the license fees it is seeking would have been an accrued liability on the Highpoint books as of October 31, 2020. St. Elizabeth surmises that it could not have assumed a liability when the elimination of such liability was consideration for the Asset Agreement (Filing No. 47 at 8).

This argument does not absolve St. Elizabeth from any liability under the LSA post-October 31, 2020, which is the issue at bar. St. Elizabeth does not cite, and the Court did not locate, any caselaw suggesting Highpoint's alleged failure to pay pre-October 31, 2020 amounts to Craneware, rendering the LSA terminated or unassigned. There is no evidence of Highpoint's failure to pay Craneware amounts owed prior to October 31, 2020, nor does Craneware allege damages for amounts owed before October 31, 2020. Craneware's underlying claim alleges damages for three years after October 31, 2020. At the very least, St. Elizabeth agreed to assume "any future payment and performance" arising in connection with the LSA, and Craneware's underlying claim asserts damages for three years following the transfer (Filing No. 1-3 at 8). Thus,

St. Elizabeth assumed the LSA for the purposes of determining whether a valid arbitration agreement exists between St. Elizabeth and Craneware.

Craneware further argues that St. Elizabeth assumed the LSA because St. Elizabeth's employees continued to use Craneware's services, which ratified the LSA. "[A] principal may be bound by a contract entered into by his agent if the principal subsequently ratifies the contract as one to which he is bound." *Carr v. Runyan*, 89 F.3d 327, 332 (7th Cir. 1996) (citing *Beneficial Mortgage Co. v. Powers*, 550 N.E.2d 793, 796 (Ind. Ct. App. 1990)). A principal may impliedly ratify the agreement "where the principal both fails timely to repudiate, and accepts benefits under, the contract." *Id.* (citation omitted). Craneware argues that "at least four (4) separate individuals, on four (4) separate occasions, utilizing [Highpoint] e-mail addresses registered with Craneware, accessed the software platform licensed by [Highpoint] under the LSA after October 31, 2020." (Filing No. 43 at 24). St. Elizabeth counters by explaining that the sporadic four logins by its employees only could have occurred if they did so pursuant to a one-year Interim Management Agreement ("IMA") entered into with Highpoint whereby St. Elizabeth would bill and collect the accounts receivable on behalf of Highpoint. St. Elizabeth therefore surmises that it could not have sought the benefits of the LSA (Filing No. 47 at 9–10).

The Court finds that implied ratification by St. Elizabeth occurred. First, it is undisputed that St. Elizabeth did not repudiate the LSA until at least July 31, 2023 (Filing No. 43 at 24). Second, St. Elizabeth used Craneware's services to fulfill its obligations under the IMA. The IMA was clearly a benefit to St. Elizabeth; otherwise, St. Elizabeth would not have entered into it.

St. Elizabeth disagrees, arguing that its use of Craneware's software to process accounts receivable for Highpoint pursuant to the IMA was only for the benefit of Highpoint (Filing No. 47 at 9). This argument seeks to parse out each obligation under the IMA and characterize such

17

obligations as benefits attributable solely to the party which the obligations are owed. Such reasoning is too narrow. While the specific act of processing accounts receivable directly benefitted Highpoint, St. Elizabeth still received a benefit in the form of consideration for the IMA. St. Elizabeth accepted the benefits under the LSA, and its argument that it did not receive any benefit by using Craneware's services to perform under the IMA is unpersuasive.

Absent language to contradict Section 1.1(d), St. Elizabeth expressly assumed the LSA. Further, absent any language indicating Highpoint and St. Elizabeth "agreed . . . otherwise" that St. Elizabeth would not assume the LSA, St. Elizabeth assumed the LSA under Indiana Code § 16-22-3-18(d) and impliedly assumed the LSA pursuant to the inferred assumption upon acceptance of transfer. *See Dr. Robert L. Meinders, D.C., Ltd.*, 7 F.4th at 562. St. Elizabeth is therefore not likely to succeed on the merits of its claims.

### 3. **No Adequate Remedy at Law and Irreparable Harm**

The Court must next analyze whether there is an adequate remedy at law and whether irreparable harm will result if a preliminary injunction is not granted. *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007). Courts in the Seventh Circuit have found that a party suffers irreparable harm when it is forced to arbitrate a claim that it did not agree to arbitrate. *See Chi. Sch. Reform Bd. of Trs. v. Diversified Pharm. Servs., Inc.*, 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999) ("In factual circumstances very similar to this case, several courts have held that forcing a party to arbitrate a dispute that it did not agree to arbitrate constitutes *per se* irreparable harm.") (collecting cases).

The County did not assume and is not bound by the LSA's arbitration agreement. Therefore, it will suffer irreparable harm and have no adequate remedy at law if its preliminary injunction is not granted. However, St. Elizabeth did assume the LSA's arbitration agreement and therefore will not suffer irreparable harm if its preliminary injunction is denied.

4. **The Balance of Harms**

The Seventh Circuit applies a "sliding scale" approach to balancing the hardships. *Cassell v. Snydaers*, 990 F.3d 539, 545 (7th Cir. 2021). "'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (quoting *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018)).

The County is likely to succeed on the merits and would be irreparably harmed if forced to arbitrate. However, St. Elizabeth is unlikely to succeed on the merits and would not be irreparably harmed if forced into arbitration. This factor therefore weighs in favor of granting the County's preliminary injunction but against granting St. Elizabeth's preliminary injunction.

5. **Public Policy Considerations**

"Courts have declared a strong policy favoring the arbitration of contract disputes." *Snyder v. Smith*, 736 F.2d 409 (7th Cir. 1984), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). However, before a court can compel arbitration, the court must find that the parties agreed to arbitrate as "'a duty to arbitrate can arise only by agreement.'" *Sysco Indianapolis LLC v. Teamsters Loc. 135*, 114 F.4th 918 (7th Cir. 2024) (quoting *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 535 (7th Cir. 2008)). Moreover, Indiana's public policy is "'determined from a consideration of its [c]onstitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort.'" *WellPoint, Inc. v. Nat'l Union Fire Ins. Co.*, 29 N.E.3d 716 (Ind. 2015) (alteration in original) (quoting *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514, 518 (Ind. 1994)).

As discussed earlier, the statutes concerning county hospitals in conjunction with Indiana's Home Rule Act make clear that the Board is the only entity that can bind Highpoint. Thus, Indiana's

public policy favors granting the County's preliminary injunction. However, both federal and state public policy weigh against granting St. Elizabeth's preliminary injunction and weigh in favor of compelling St. Elizabeth to arbitrate. As explained above, St. Elizabeth expressly agreed to assume the LSA and did not disclaim such assumption in the LSA. Indiana Code § 16-22-3-18(d) also caused St. Elizabeth to assume the LSA unless it agreed otherwise, which it did not.

### 6. **Conclusion**

For the reasons stated above the County has satisfied its burden of establishing: (1) that it is likely to succeed on the merits of its claims; (2) that it has no adequate remedy at law; (3) that it is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in its favor; and (5) issuing the injunction is in the public interest. Therefore, the County's Motion for Preliminary Injunction is **granted**. However, St. Elizabeth has failed to establish the above factors. St. Elizabeth's Motion for Preliminary Injunction is therefore **denied**.

### B.     **Craneware's Combined Cross-Motion to Stay and to Compel Arbitration**

The Federal Arbitration Act ("FAA") governs Craneware's Motion to Stay Proceedings and to Compel Arbitration. 9 U.S.C. §§ 1–402. Section 2 of the FAA states, in relevant part:

> A written provision in . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

9 U.S.C. § 2. Further, pursuant to Section 3 of the FAA, "upon being satisfied that the issue involved in such suit . . . is referable to arbitration under such an agreement, [the court] shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. When the "contract delegates the arbitrability question to an arbitrator, a court may not override the contract,

even if the court thinks that the arbitrability claim is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019). However, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Id.* at 69. For the reasons discussed above, the Court concludes that a valid arbitration agreement exists, at least between Craneware and St. Elizabeth. Craneware's request to stay proceedings is thus **granted**.

Section 4 of the FAA states that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Further, "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* Lastly, "if no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue." *Id.* While the making of the agreement for arbitration and the failure to comply is at issue, none of the parties have demanded a jury trial. Therefore, Section 4 of the FAA authorizes the Court to determine this issue and if a valid arbitration agreement exists between the parties, make an order directing those parties to proceed to arbitration. As discussed above, a valid arbitration agreement exists between Craneware and St. Elizabeth but does not exist between Craneware and the County. Craneware's request to compel arbitration is therefore **granted in part** as to St. Elizabeth and **denied in part** as to the County.

## IV.   CONCLUSION

For the reasons stated above, Dearborn County's Motion for Preliminary Injunction (Filing No. 25) is **GRANTED**, and St. Elizabeth's Motion for Preliminary Injunction (Filing No. 5) is **DENIED**. Craneware's Combined Cross-Motion to Stay Proceedings and to Compel Arbitration (Filing No. 42) is **GRANTED in part and DENIED in part.** The Motion to Stay is **granted**, pending arbitration. The Motion to Compel Arbitration is **granted** in that St. Elizabeth Medical Center, Inc., and Summit Medical Group, Inc., are ordered to participate in the arbitration proceeding initiated by Craneware, Inc., and Craneware plc. The Motion to Compel Arbitration is **denied** as to Dearborn County, and the County need not participate in arbitration.

This action is **STAYED** pending conclusion of the arbitration between Craneware and St. Elizabeth, or further order from this Court. The parties are to provide periodic updates as to the status of arbitration, the first being due no later than **September 18, 2025**.

**SO ORDERED.**

Date:   3/18/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Mark Jason Crandley
BARNES & THORNBURG, LLP (Indianapolis)
mcrandley@btlaw.com

David Michael Dirr
Dressman Benzinger & LaVelle psc
ddirr@dbllaw.com

Michael Gary Swansburg, Jr.
Swansburg & Smith, PLLC
mgs@swansburgandsmith.com